and it's in raid at Chocolate Confectionary Antitrust litigation at all, at all, and we'll call Mr. Montag. Good morning, Governor. Now, we realized yesterday we had a big exhibit here and everything, and today nobody has any chocolate. You eat chocolate all the time in the district court, yeah. I'm Rodney Montag, representing the class plaintiffs in this appeal. Your Honor, I'd like to reserve two minutes, if I may. How much? Just two minutes. Two minutes, okay. Make sure you speak loudly into that microphone. Thank you. Your Honor, this involves the direct purchasers of singles and king-sized, standard and king-sized chocolate bars, which are immediate consumption and are different from packages of chocolate bars and packaged candy. We have one story. The defendants have another story. Our story is based on circumstantial evidence, which when viewed in the most favorable light and when viewed as a whole, we believe gives rise to a reasonable inference that defendants more than likely were not active collusively, and that should be sufficient to reach a jury. I think the major error that we believe the district court made— Keep that voice up, Mr. Montag. I'm sorry, Your Honor. The major error that we believe the district court made was that it accepted defendants' evidence and then said that the plaintiffs must disprove it rather than looking at the plaintiffs' evidence and saying whether or not that gave rise to reasonable inferences, which made it more likely than not that the defendants were active collusively. Well, there's some examples where the court said that you had to disprove it. Probably the best example is costs, where we had a whole— we had a section on costs which showed that it was against the interests of the defendants to go along with those prices that were raised by Morris, particularly in 2002 and the effect of 2003, where we first had the CEO of Hershey, Mr. Lennie, who said that there were commodity costs for 2004, so there was no need for Hershey to raise prices. In fact, many of the people in the Hershey pricing department didn't want prices to be raised. Morris, in a later document, said that commodity prices were at their lowest during 2002 and 2003. Well, even if that's accurate, what evidence can you point to that showed that the defendants acted against their self-interest that goes beyond interdependence? Well, we had three reasons for that. One was the cost, particularly with respect to Hershey following, when Hershey had no reason to follow those costs— to follow those price increases at that increased level. In other words, Hershey had a very— their costs were the lowest. They were very well protected through 2004. If they wanted to raise prices, they could have followed and raised prices, but not at the high level that Morris had raised them. And this was found out by the regression analysis that was done by Dr. MacLean. Was there any evidence in the record that when one candy company raised prices, but the others didn't, that the supermarket or other point-of-sale vendor would have disparate pricing among the three companies? It's set forth in our brief, and I don't have the pages here on it, but there's a series of evidence in our brief where the executives of the companies recognized that all the people did not follow, and sometimes they all increased prices, sometimes they didn't. Well, I'm not talking about the candy companies. Where in the record is there evidence that point-of-sale vendor number one would allow the Kings and Singles to be sold at disparate prices depending upon what Morris, Hershey, or Nestle charged them? I don't know that there's evidence from the retailers, but there are admissions by the chocolate companies that that occurs, and that can be expected. It is in our brief. I don't have the exact page reference to that, but there's no retail evidence that that happened. I don't believe there's any retail evidence. There's a lot of evidence in the record that, in fact, if one raised prices, one of these three companies raised prices, the retailer raised the prices on all three in lockstep.  Some did, and I think that evidence, I believe, only came from supermarkets, but I'm not positive of that. The evidence came in the other case from the opt-out cases. I don't believe there's any evidence from the class payments cross-examination that they did that. I think the companies recognized, again, it's in our brief, that the retailers did not always what they called line pricing and the one raised prices, they all did. Some did, some didn't, but they certainly didn't. And it's interesting that that... I'm just asking for a record citation of that. I didn't see that. Okay. I mean, you took 150 depositions. You've got millions of documents. I would expect the record to show that there wasn't line pricing. It's my understanding that this industry, being an oligopoly, had line pricing. Okay. I can give you the record citation. It's the Joint Appendix 8555, and it's document 1296 at page 172-172. It's on page 22 of our reply brief. I think that's easier than to give you a bunch of numbers. But the other evidence is the multiple regression analysis that Dr. even discussed in the opinion, in which where he found that the increases were not justified by cost increases, that something was justified, but not to the extent that it was. And he found an all-in-one charge of over 7%. And he used actual Hershey costs. He used Morris costs as best he could. And Nestle never produced costs in this case, so even their witness couldn't use Nestle's costs. Whatever data Nestle produced was not usable or reliable. So that's the first reason it was against interest. The second reason it was against interest that he relied on was that, I mean, it was in their interest, was because Morris said it raised prices in order to surprise its competitors. Well, the record shows and our evidence shows that, in fact, there was never any surprise, at least by Hershey. Hershey, in 2002, which is really the genesis of this conspiracy, Hershey was ticked off about Morris raising prices in mid-September at a time when the trustees of the Hershey Trust took Hershey off of the market. Hershey had been up for sale and was negotiating with Nestle. How do you say they were ticked off? That's a little bit stronger statement than saying there's advanced information. Well, they had a document that said in mid-September they were considering a price increase, that Morris was considering a price increase. Now, there's a lot of things that show that. Does the record show how they got that document? Well, there are two theories of how they got the document. There's a record, there's a document in Hershey that says there was a rumor from cocoa traders. Right. Okay, so we never found out. So the rumor came from cocoa traders. Somebody says to Hershey, you know, we think Morris is going to increase the price of their M&Ms by three and a half cents. But Morris didn't say, Morris didn't call up Hershey and say, you know what? We see an opportunity here. We're going to go up three and a half cents. Well, we presented evidence to show that it was unlikely that it would be a cocoa broker that gave that information. And I can go through that. But there's no direct evidence. You'll acknowledge there's no direct evidence that they specifically were given that information in a conspiratorial fashion. There's no direct evidence. Okay. What's your strongest piece of circumstantial evidence from which you can infer that there was a conspiracy here? On that particular 2002 piece. Let me start with Morris. Morris said that they kept the information very close to the vest. There were very few people who knew about it. And it was a dismissible offense if they leaked it. So it's very unlikely that in September that someone would leak to a cocoa trader. And it's only this small group of top executives. It's very unlikely that they would leak something to a cocoa trader. That's number one. So you want to go to the jury and say to the jury what you just said to us. It was unlikely. I'd like to say why. There's more than what I just said. Okay. The second point was that – let me just put a blanket on. I apologize. Mr. Montag, we can have you back. We can go to Mr. Chatelain if you want us to. No, that's okay, Your Honor. I think I got a little out of sync here with the question, and I apologize. And that was not my intention, did it? That was not my intention. You may have seen that we do like to ask questions. I'm well aware of that. Why don't we call Mr. Chatelain to get his views on this, and then we're going to have you back for rebuttal anyways. Can I get more than rebuttal, Your Honor? We'll give you an extra minute on rebuttal. Okay. Thank you. May it please the Court, Steve Chatelain on behalf of the individual obtainists. With the Court's permission, I'd like to reserve two minutes for rebuttal. We don't typically allow two parties from the same side to each have rebuttal, but in this case we will, but we're going to give you a lot of time also. Thank you, Your Honor. Appreciate that. Thank you. The District Court fundamentally misunderstood the famous evidence in contentions regarding the relevance of the fact that there was an express collusion among the Canadian subsidiaries and affiliates of these U.S. domestic defendants in Canada at exactly the same time that the lockstep price increases were occurring in the United States. That seems to be the crux of your case. It happened there. It happened here. But you've got to tie them together. It can't just be assumed. Right. What's your best evidentiary support for the fact that what happened in Canada influenced what happened here in the three price increases? Okay. There are really two sets of evidence on that. One I would call structural evidence. That is, it's an immediately adjacent geographic market with the same industry structure that is highly concentrated, the same industry participants. Let me talk about that. Does the record show that the prices were increased at the same level nationwide in the U.S.?  Okay. Go ahead. Thank you. So you've got the same market structure, highly concentrated. You have the same market participants. You have a lot of the same customers like the Walmarts and the Sam's Clubs that are operating both in the United States and Canada. And you have the same fundamental products or candy bars. And then we get into more specific evidence. And here, Judge, I really want to get to what I think is the crux of your question. The same executives in the United States for each of these three defendants also had pricing authority, ultimate pricing authority, with respect to pricing in Canada. That's a major fact. And the third fact is that each of these U.S. domestic competitors knew that the others, that their competitors in the United States, also had pricing authority in Canada. So let's start there with the structure. Now let's get to specific instances. And the district court, with respect, cited some of this evidence but then left out key pieces of it that we think goes far across the line here in terms of showing the sort of palpable tie that the district court said was required and said was absent. We think it's present. Let me start with Hershey. Richard Lennie was the U.S. executive with pricing authority both for the United States and Canada. When the Canadian trade spend conspiracy started in 2002, Mr. Lennie personally got deeply involved in getting what he called control of trade spend in Canada. He made it one of his top priorities. He thought that the trade spend and his promotional spending, discounts and so forth in Canada, was out of control, and he wanted it brought under control. And it was exactly at that time that we now know from the Canadian indictments and so forth that the Canadian conspiracy to control trade spend was hatched. So that's Mr. Lennie's deep involvement in that issue. More specific information, the 2003 price increase in Canada, Judge, Bruce Brown was in charge of Canadian operations for Hershey Canada. He reported to Barton Snyder, who was on the executive committee for Hershey International, the international group, and then Snyder reported directly to Mr. Lennie. Brown reports to Snyder that there were, quote, rumors that Mars wanted to follow a price increase in Canada that Nestle had initiated. So the timing is, Nestle Canada announces a price increase. Mr. Brown hears, quote, rumors that Mars wants to follow the price increase in Canada, but that Mars wants Hershey to go first. Okay? Mr. Brown reports that to Snyder, who reports it to Lennie. Back comes the direction from Snyder to Brown, follow the price increase. And that's what they did. So we have the U.S. executives in charge of pricing in the United States being told that there are rumors that Mars wants Hershey to go first. So that's what that all relates to, the Canadian conspiracy. It does. Correct? And to the U.S., in the sense that it is the U.S. executives who we— a jury could properly conclude from this evidence. Let me tell you the other fact first. Not only did Hershey, U.S. pricing executives, say, yes, follow as Mars requested, but they did it before Mars. In other words, the request from Mars Canada was, Mars wanted to follow the price increase, but they wanted Hershey to go first. Hershey, in fact, went first. So what happened was there was a mess leak, the request by Mars that Hershey go next, Hershey goes next, and then Mars follows Hershey in Canada. So yes, it has to do with pricing in Canada. Right. But this shows, we think a jury can reasonably conclude from this and the other evidence taken together, that at a minimum, at a minimum, the U.S. Hershey executives knew that there was an express collusion in Canada, and at a maximum, that they directed that it occur. And that puts them in a soup in Canada, but it doesn't shed any light on here. And there's no allegation currently from Ron that there was a trades bank conspiracy in the U.S. Well, is that right? There's no allegation of a trades bank conspiracy in the U.S., but here's how it's rolled with respect. We have an oligopoly in the United States, okay? And an oligopoly can either be competitive or non-competitive. The companies can... Some might say by definition they're non-competitive. Well, from a consumer standpoint, those of you who float on airplanes lately might say that. On the other hand, there are things like Big Box, all the supply stores that fight like cats and dogs. It depends on the industry. Sometimes they're competitive, sometimes they're non-competitive. We think there's evidence here that the jury could reasonably conclude that until 2002, what we had here was a competitive oligopoly. That is, Hershey, in 2001, had tried to take the price increase. They announced that they were taking a price increase on packaged candy. And Mars did not follow. And Hershey paid a terrible price. They lost all kinds of markets. Were they competitive in 79? We don't know. What about 86? We don't take a position on that. 91, 95? We don't take a position on that one way or the other. What we do know is that in 2001, the immediately preceding time period, it was competitive. And there was another failed price increase at the beginning of 2002. Let me ask you, the description you had just given about Mars following Hershey, is this an element used by the plaintiff's expert witnesses and their determinations of the likelihood of collusion? Yes, it is. It's a very important part of Dr. Velturo's expert report, which survived a dollar challenge. And he explained what I'm about to explain now, is that the real relevance of the Canadian conspiracy is if you have the U.S. executives with pricing responsibility having knowledge of or directing that Canadian conduct, that shapes the expectations of the U.S. executives as to what will happen if they take a price increase in the United States. But let me say, if they say, well, we don't need to, if Hershey says, we don't need to call Mars because we know they'll follow us, that's not collusion, right? Well, that's interdependence. That's all that happens, but that's not what happened here. They would know from the 2001 and 2002 failed price increases that Mars would not follow them. And the question is, what changed that expectation? And Dr. Velturo, in his expert report, let me give you a side, because I think this is very, very worth the court looking at. He has what he calls a thought experiment. It's at the joint appendix 2193-94. And he says, let's just hypothesize that what happens is this. The U.S. pricing executives for these three defendants get on a plane and fly to Canada. And while they're in Canada, they say, expressly, let's all take a 10% price increase in Canada. And they don't say a word about what's going to happen in the United States. Okay? But they expressly collude in Canada. They get on the plane, they come back to the United States. The immediately preceding thing that had happened was a failed price increase. They did not follow the leader. But now, having jointly colluded in Canada, these executives come back to the United States, and one of them says, I'm announcing a 10% price increase in the United States. And Dr. Velturo makes the point, he says, it is patently clear that the conduct in Canada, the experience in Canada, that life is better when we follow each other  than what's going to happen in the United States, that that conduct, that experience with respect to Canada is going to change the competitive landscape and the probable reactions of the U.S. executives. Everything you just said, Mr. Shadower, may be true as a matter of fact, but don't you run into the case law which says if the evidence is equally demonstrative of interdependence, as it is of conspiracy, then that's not enough to survive summary judgment? Well, we haven't really talked about the flat glass case or the baby food case. I'm interested in your view as to how your case is more like the flat glass case than the baby food case where summary judgment was affirmed. Certainly. So one of the things that flat glass says is that there's no exhaustive list of plus factors. And then we have the second circuit case of Todd versus Exxon that says use of a facilitating device is a major plus factor. So we think that where the district court went wrong here was not accepting this evidence of the Canadian conspiracy and not just evidence that there was a conspiracy in Canada. It was not just that it happened there so it may have happened here. There's evidence that the U.S. executives with pricing authority at the minimum knew that there was a joint conduct in Canada. At a maximum, directed that it occurred. And Dr. Bertoureau says, but we all know, that that wouldn't necessarily shape the thinking, the expected reactions of the U.S. customers, of the U.S. pricing executives with respect to U.S. pricing, and that that's a major facilitating device. There are cases going both ways about conspiracies in other countries. And it would seem that the closer the conspiracy is, the more likely that there is some lead over. Can you distinguish yourself from that reasoning? I forget the name of the case. The Williamson case in the 11th Circuit, for example. And there, that was a pleading case, and the plaintiffs just failed to come forward with evidence linking the alleged European conspiracies with anything to do with the United States. Our case is the total opposite of that. And the court has appropriately asked, what's the evidence that links U.S. pricing with the Canadian conspiracy? And I've tried to lay that out for you with respect to Hershey. The same thing happened again, by the way, in the 2005 price increase in Hershey. 2004? Pardon me? 2004? The 2005 price increase in Canada. And again, you have the same Canadian Hershey executive, Brown, reporting to the U.S. executives. There are, quote, rumors. And I put quotes around that because we now know from the 2005 document that when Mr. Brown says rumors, he means that he had direct communications with the chief conspirator in Canada. Mr. Shadwell, we're going to have you back on rebuttal. Your time is up. Okay. Thank you, Your Honor. Mr. Cavanaugh. Thank you, Your Honor. We've had it on behalf of the Hershey Company and Hershey Canada. Counsel and defendants have agreed to split their time. I'll try to provide the court with an overview, address issues specific to Hershey. Mr. Marks, on behalf of Morris, will address Canada, as well as issues specific to Morris. And Mr. Mall will address Nestle USA, both in the U.S. and in Canada. And he's promised to correct any mistakes that I make. There is no doubt here that the plaintiffs were given ample opportunity, dozens, hundreds of depositions, millions of pages of documents, in an effort to prove their theory that four companies entered into a series of secret conspiracies regarding misprice increases about certain childhood products in 2002, again in 2004, and again in 2007. As they've acknowledged, they have no direct evidence. We would submit they have no circumstantial evidence of, as this court said in Baby Foods, the reciprocal exchange of information by executives charged with pricing. There is simply no evidence of that. What you heard this morning is that Hershey got, heard from cocoa suppliers, a rumor that Morris was considering a price increase. There's a contemporaneous document that states we got the information from cocoa suppliers. There is a third-party analyst report, and that's the exact same time period, saying the chocolate manufacturers are going to have to increase their prices. Let me ask you. Dr. Volterro passed a gateway to be an expert witness. And maybe when his reports are suggested to the jury, they will say this is nothing very persuasive. But at this point, we have Dr. Volterro's report, based upon the interaction and the control over pricing from the U.S. in Canada, that this is an indication of the likelihood of conspiracy. We can't simply disregard Dr. Volterro's testimony. The credibility of Dr. Volterro's testimony, at this point, has to be looked at in light most favorable to the plaintiffs, right? Your Honor, certainly the evidence must be looked at in the light most favorable to the plaintiffs. But Dr. Volterro has a theory of actuation. What this court said in Baby Foods is that what matters is the non-economic evidence of conspiracy. What you just heard counsel refer to, I thought, tellingly, was a thought experiment by Dr. Volterro, not evidence. There is no evidence linking what is alleged to be not a less-priced conspiracy in Canada, but something having to do with discounting. Here, in the United States, the allegation is that there was a less-priced conspiracy. None of the grocery company has been charged up in Canada with respect to any sort of discounting conspiracy. But there was price-fixing involved in Canada, too. The district court heard in that respect, you would concede, no? It was probably trade spend, but there was a price-fixing element to it, wasn't there? Well, what Hershey Canada pled guilty to was a communication in 2007 regarding a less-priced increase. That actually did not go into effect. The earlier period involving a wholesaler, to my knowledge, simply involves trade spend and discounting. But to get back to your question, Your Honor, Dr. Volterro has a theory of actuation. He does not have evidence of conspiracy. And under this court's case law, it's that evidence of conspiracy, the actual evidence of reciprocal exchanges of information, that should be the principle on which it's determined whether they come forward with sufficient evidence to exclude the possibility of competitive conduct here, as opposed to collusion. But his theory would be expert testimony, if you were given the opportunity to testify. It would be. Okay, so you're not saying that that's not evidence? It is evidence, but it's not evidence. His effort is to say, well, I think what happened up there actuated what happened down here. That's a theory. But he doesn't have, but there is no evidence showing that... You're saying there's no evidence to support his theory. That's correct. But his testimony would constitute evidence. That's correct. It would constitute evidence. And he has passed the gateway to being an expert witness. He would testify, which you're even hearing, right? That is correct. But to give you an analogous case which isn't cited in our briefs, go back to the Brandeis Antitrust case back in 1998. Dr. Wilkinson, Nobel Prize winner, got on the stand and testified. He thought there was conspiracy among drug manufacturers. The district court accepted that testimony. Seven circuits said, that's fine. That's accepted. But there was no evidence to support it. The district court granted a directed verdict, equivalent to a summary judgment. The fact that he opened an expert opinion doesn't replace the fact that there has to be actual, non-economic evidence of conspiracy. At this stage, I don't know that you can argue that question. I mean, we're looking at whether or not the district court was correct in granting a summary judgment. Well, it was a directed verdict. And, fine, nobody is very competent to understand it. But, apart from Dr. Velturo, there simply is no evidence to support this. Dr. Velturo, for example, acknowledges that in the United States, he's in an oligopoly and that ESG price increases regardless of cost or demand. And he agreed with the finding in Merck Group that in an oligopoly, the participants will share in the monopoly rents. So, effectively, Dr. McClain's regression and the opinions by the experts that there's super-competitive pricing doesn't really advance their case at all. Because, as the district court correctly said, and as this court has noted in both FACWAS and DATAGLASS, well, that's what you expect. You expect to see interdependent pricing. And, therefore, one would fully expect to see super-competitive pricing during this period, as well as parallel pricing. This is, of course, then made for conscious parallels that can't be inferred even from parallel pricing, because that's what you expect. And we went on further in this case to show, historically, you see interdependent pricing as well as something that goes beyond what you see in your typical oligopoly, which is meet-or-follow pricing, which is perfectly lawful. Here, there's the added component of one pricing, which is that retailers will take the price up. As noted in one of the Mars documents, well, we have to go up. They were following an additional move by Hershey. We have to go up, because the market's going to go up without us. Well, but that did not affect the market when Hershey did the 2001 price increase. That was on packaged goods, Your Honor. It was not on singles and kings. And the direct plaintiffs dropped their packaged goods case. The independent plaintiffs couldn't respond to the fact that packaged goods are very different, because the weight and the volume to be altered with these packages and with market dynamics are very different. And I would point out, Your Honor, the reason it failed illustrates that point. What Mr. Lilly said was, Mars adopted as a packaged goods a better strategy, because they changed the weight. Hershey took a price increase. They reduced the weight and the volume, effectively taking a price increase, and that was a better strategy. That's something that in packaged goods can be readily accomplished, and you don't see the same type of leader-follower behavior in packaged goods. So the 2001 failure, Your Honor, is in a different market, which they acknowledge has different market dynamics than the singles and kings market, which, going back to 1979, you see this type of leader-follower behavior. And you look at the discussion contemporaries with each price move by these companies. You see references to being surprised, being put into crisis mode. Hershey, Mars taking the lead, Hershey taking the lead on the changes in it, Mars having to respond to that. You see in 2007, when historically price increases happened towards the end of the year, what Hershey didn't know was that Mars couldn't take a price increase at the end of 2007, because they were changing their computer systems. They, Mars, did it in the spring and put Hershey into crisis mode because customers stock up on the lower-priced product until you get your act together and increase your price. So the contemporaries' documents for each of these price increases, I would suggest, completely undercut Dr. Velturo's opinion about actuation. They show the complete absence of any coordination of price. Great. Mr. Kahn. Thank you very much. And we'll hear from Mr. Marks. Thank you, Your Honor. May it please the Court, I'm David Marks, representing Mars. I'm going to address two topics. One, the lack of any evidence. Lack of any evidence implying the traditional conspiracy, non-economic evidence of an actual manifest agreement not to compete as it relates to Mars. And second, I want to talk some about the issues that you've raised with respect to Canada, because Judge Connor got them exactly right. It's important, when we focus on Canada, to understand that Dr. Velturo's actuation theory is a theory. There are no facts to support that it actually occurred. Most specifically, there's no evidence, as Judge Connor found, to support the actuation theory or to establish that there's a palpable tie between Canada and the United States. The reason Judge Connor found that the theory failed was because there's no evidence in the record that the domestic executives were aware of that Canadian trade spend conspiracy. And Judge Connor walks through Dr. Velturo's theory very carefully, and he says, Dr. Velturo concedes that there is no record evidence establishing that the defendant's domestic price decision makers had explicit knowledge of any anti-competitive or unlawful activity in Canada. What about the email from Mr. Braun to Bert Snyder? Mr. Braun to? To Mr. Snyder. That may relate to what Hershey knew, but there's no evidence that it relates to Mars. And Dr. Velturo conceded that there are no documents. This is what Dr. Velturo said. No documents or other evidence, contemporaneous or otherwise, which indicate that defendants' domestic decision makers were even aware of the Canadian trade spend agreement. And it doesn't at least show that the U.S. executives knew that there was a Canadian conspiracy. Respectfully, Your Honor, it may show that one of the company's executives knew. Maybe that Hershey's knew. But there's nothing with respect to Mars. There's no evidence at all that anybody at Mars knew about any other country. Doesn't that at least fuel the actuation theory? Again, they've got to demonstrate that it instigated a conspiracy in the United States, that there would have been an agreement by U.S. executives about U.S. prices. The fact that Hershey may have known something about what was going on in Canada, and bear in mind either Nestle Canada or Mars Canada, has been convicted of doing anything wrong yet in Canada. But it says nothing about what Mars executives knew. And also remember that the issue of Mars Canada's relationship to Mars United States was addressed by this court, and likewise, Nestle Canada is a Nestle United States. I don't like to do Mr. Morrow's job for him, but I can cover both at the same time. It was addressed by Judge Conner in the context of the motions to dismiss Mars Canada and Nestle Canada, which were originally defendants in this case. And with respect to Mars Canada, Judge Conner found that the relationship between Mars Canada and Mars U.S. is a vapid relationship in the United States. Entering American territory only, and this is Mars Canada, only to engage in periodic organizational meetings and purchase raw materials. Several degrees of separation, Judge Conner found, separate from American consumers and its operational activities occurred entirely in Canada. Didn't they need to get approval from U.S. executives? The record evidence shows that the approval really wasn't approval. It was informational only. When Mr. Robinson, I think the two examples at the plaintiff's site, or one example at the plaintiff's site, was Mr. Robinson informing, simply informing Mr. Gancourt that there was going to be a price increase in Canada, which occurred the very same day. It wasn't approval. The U.S. executives were not actively involved for Mars in Canada.  And bear in mind, plaintiffs never appealed Judge Conner's ruling dismissing Mars Canada from this case. And it was also found in connection with all the pricing stuff. There really wasn't any involvement. Different people and different organizations, Mars Canada had no involvement in Mars U.S. pricing. Mars U.S. had no involvement in Canadian pricing. They were separate organizations. Was there some reporting relationship? Of course, which is what you would expect. But there's no evidence that anybody at Mars U.S. knew about any of the unlawful conduct that's been alleged in Canada as it relates to Mars Canada. So, again, I think that's why Judge Conner got it right. There hasn't been a palpable tie that's been established between Mars Canada and Mars U.S. Mars is privately held, correct? I'm sorry? Mars is privately held. Yes, it is privately held. Now, what about Dr. Thomason's expert opinion? He doesn't go to this actuation theory, but he says that the evidence of what was happening in Canada at the same time should be considered in determining what was happening in the U.S. And, again, of course, the plaintiffs have two different theories about how it is that Canada relates to the United States. But with respect to Dr. Thomason, I think, again, he fails to identify any evidence that supports the notion that what happens in Canada relates to the United States. But you have the same guys sitting on top who are in charge of pricing in both countries. No, respectfully, Judge Roth, I don't think that's right. The people who were... Do you have a chief executive officer? Yes. In the United States, responsible for both Mars U.S. and, ultimately, for Mars Canada. The people with the decision-making authority for Mars in Mars Canada were different from the people with decision-making authority for Mars in the United States. And those decisions were made... The people in Mars Canada that made those decisions, did them independently of consultations with people in the United States? Did they inform them? Yes. When prices were changed in the United States, those decisions were made by the individuals at Mars U.S. Did they consult with people in Canada? No. Did Mars Canada know that there was a price increase that had been announced in the United States? Of course. A matter of public record, but they weren't consulted. There was no involvement. To the extent that Mars Canada manufactured candy that might have been sold in the United States, the evidence is clear. There was a transfer price established between the two companies, and, basically, Mars Canada served as a wholesaler to Mars U.S., which then priced those products in the United States independently and unilaterally. Same thing happened going in the other direction to the extent that it did. They're really... They're sister subsidiaries that operated independently. That's one of the reasons why Mars Canada was dismissed early on in this case. Do you know why not early on in the baby food case? Was there a finding of conscious parallelism in that case? Actually, there wasn't, Your Honor. I don't think there was much of a finding of conscious parallelism in that case, either. I know it's you. And we don't dispute the finding of conscious parallelism. The question is, since conscious parallelism all by itself isn't unlawful, as we know, is there any evidence implying that traditional conspiracy, non-economic evidence? And, again, as it relates to Mars... And be careful, because when the plaintiffs talk about the defendants, they sometimes don't distinguish between each of us. When it comes to Mars, we don't think there's any evidence, any evidence, that suggests that it was involved in a conspiracy. These facts, I think, are important. All three price increases in the United States effectively were initiated by Mars. In 2002, 2004, Mars' decision on future consumption, packaged products, is what led Hershey a month later to initiate a price increase for immediate consumption goods. And in 2007, of course, Mars initiated the price increase. There is not a shred of evidence, not a shred of evidence, that Mars knew anything about anybody else's intentions at the time that Mars either announced the price increase in 2002, announced the weight change with respect to packaging products in 2004, or announced the price increase in 2007. No evidence that we knew anything about what anybody else might do or what their intentions were. We were certainly aware of the concept of line pricing, and in 1998, we had adopted what we called a fast follower policy that basically said if somebody else initiates a price increase for immediate consumption goods, we're going to follow. We did that because we perceived that line pricing was rampant in the industry, and whether everybody did it or not, as long as there were some people doing it, we needed to protect ourselves. That's why we adopted that policy. And I think it's important to note that the contemporaneously prepared business documents, certainly for Mars, which I can talk about better than I can for Nestle and Nestle U.S. I have to say U.S. every time I say Nestle, or Hershey, because all of the contemporaneously prepared business documents that Mars had when it made the decision to raise its prices demonstrated it had no knowledge of what anybody else was doing. It deliberated, it made decisions after studying whether or not, and retaining McKinsey in 2006 to help it plan price increases in 2006 or 2007. Again, that belies the existence of any conspiracy. And it's important to remember, even as you evaluate Dr. Velturo's actuation theory or Dr. Tolleson, the human highlighter's articulation of plaintiff's theory, that the inferences that the plaintiffs want you to draw have to be reasonable inferences. And respectfully, we suggest that the inferences that they're asking you to draw about that third plus factor, the most important of them, are not reasonable. And therefore, we request that you affirm Judge Conner's decision. Thank you. All right, Mr. Marks, thank you very much. And we'll now call on Mr. Moll. Now, Mr. Cavanaugh, I said I'll correct anything that he said that was incorrect. He was right, Your Honor, and may I have some additional time to do that? I might have to go catch an airplane before you. Good morning, my name is Peter Moll. I'm with the Kegeler Law Firm, and I represent Nestle USA. And it is fitting that I get to argue last, because Nestle USA has a minor market share of only 8 percent and is literally forfeited by Hershey and Morris with their combined 70 percent, and because historically, the record shows, Nestle USA has always followed Hershey and Morris. Well, I didn't know that. Maybe you could increase your market share if you didn't. Well, that's not what Professor Tolleson thought. In fact, Nestle USA has historically spent more on trade spend, had much, had effectively lower prices, and historically, much thinner margins than Hershey and Morris. Yet, Professor Tolleson said, despite that, Nestle USA made little or no headway against Hershey and Morris. There's no reason to believe that, and indeed, Your Honor, I think in an oligopolistic type of industry, this Court, in the Petrucci case, spent some time at page 1244 going through oligopolistic theory and quoting extensively Professor Areta. And for instance, it is quite likely that oligopolists acting independently might suffer the same above-marginal-cost price as their competitors because the firms are interdependent, and competitors would match any price cut. And so, again, Nestle USA's experience here is very much that it was in its interest. And if you look at where Nestle USA was, if you put yourself in Nestle USA's position in 2002, December 2002, they had a better price increase since 1995 for seven years. Dr. Marshall and Noah Milley attacked Professor Marshall's computation of cost increases from 1995 to 2002. There was a major brouhaha about it after that, but not in 1995 to 2002. They said Nestle's costs had gone up 15.5 percent. Demand was increasing, not dramatically, but demand was increasing. Nestle USA had little or no excess capacity. And in September of 2001, Frank Higgins, in a memo, the planning state was asked to develop a price increase plan and was not asked to do any such thing. He was asked to look at Nestle's options, exit, acquire another company, or just get out of the business. And you tried to acquire Hershey. Acquire Hershey, yes, when Hershey came up for sale, yes. And you had some of that information. You certainly had Hershey's information, financial data. Your Honor, there was a Nestle essay led to charge on that. There was a joint bid between Nestle and Cadbury. There were meetings in New York. The CFO of Nestle was there, testified. There were hundreds of lawyers. There was a weight room. And there's nothing in the record that Nestle USA obtained any inappropriate information from that. Indeed, there's an allegation that Cadbury obtained some inappropriate information that perhaps it was appropriate for Cadbury to have because it wasn't a competitor, but there's no evidence that Nestle USA ever found out about it. What about the fact that Nestle's Canadian president, Mr. Leonidas, he was apparently one of the ringleaders of the Canadian conspiracy, but he was also involved extensively in the U.S. market and had some significant participation in the attempt to purchase Hershey. Well, he was there at the Hershey deal because Nestle USA was also going to buy Hershey Canada. And that's why Mr. Leonidas was there. And if you look at the sworn testimony in this case, what Mr. Leonidas testified to is I was really stuck in a hotel room and I was looking at I.R.I. data. That's what I was doing. My involvement was very limited. But let's address that issue because if we look at Canada, and this is not something that we stressed in our briefs. We said there was extensive discovery, 150 depositions, 12 million documents. There was extensive discovery in Canada itself. Nestle Canada, Mars Canada, Hershey Canada, all produced documents. The alleged participants in these activities in Canada were all deposed. And it's not a pretty picture to read. If you were there in the NHS, you might be staying up at night. However, one thing is clear. From all of that, it involved Canada and pricing in Canada. And it had absolutely nothing to do with the U.S. And that's all across the board. It's all through everything. And in addition here, we had the cooperation of Cadbury. Cadbury was originally a defendant in this case. Cadbury was involved in what was going on in Canada allegedly. And Cadbury had a cooperation agreement with the plaintiffs here. And yet there is not a scintilla of any evidence from Cadbury that anything that happened in Canada had anything to do with the U.S. And indeed, Your Honor, since Cadbury was in New York at the Hershey sale, there is not a scintilla of evidence from Cadbury that anything inappropriate happened with that. Not a scintilla of evidence in this record. I also want to address, and I think I really need to address, something that came up on Nestle Canada and Nestle USA. And when we start talking about, Mr. Shadowin said, and I think he misspoke, hopefully he did, that the same executives here in the U.S. had pricing authority over what was going on in prices in Canada. That is simply not the case as to Nestle USA. As Judge Conner found, we were distinct here. Nestle Canada was not a subsidiary of Nestle USA. Nestle Canada is a subsidiary of Nestle USA reported to Bavay, Switzerland, as did Nestle USA. As Mr. Mark said, they were dismissed out of his case because they don't do business down here. There is not a scintilla of evidence that anybody from Maryland to Nestle USA approved any price increases, had any authority over any price increases in Canada, or had any authority over any operations in Canada. There is not a scintilla of evidence. There are no common officers, directors, employees of those two companies. There is absolutely nothing there, as far as Nestle USA is concerned, in Canada. And as I said, they said, well Canada is the same as the U.S. It's the same conduct. Look at what happened in Canada. There was a trade stamp conspiracy. And it all was in the middle of it. It was sending out these ticket action mail notices. As counsel admitted, there was no trade stamp conspiracy in the U.S. And what was going on in Canada? Eventually, there was allegedly a price increase conspiracy on misprices in 2003 after our December 2002 increase. Well, in 2003. But what was going on in Canada? Was Nestle charged? Nestle was charged in Canada, were they not? Nestle Canada was charged, as was Mr. Leonidas, and another Nestle executive in an indictment that charged them with fixing prices of candy sold in Canada. In Canada. Period. But isn't the fact, or let me put it this way, is the fact, of formal charges in Canada against the participants in the chocolate industry, is that evidence from which at least some inference can be drawn that U.S. executives knew about the existence of a Canadian conspiracy? No, because first of all, Nestle Canada and the executives of Nestle Canada have not been convicted of anything. So there's only Hershey who's pled. They have pled. So there's not a conviction up there on that charge. If you look at the relevant period of time here, 2002 to 2007, we're talking about indictments in 2014. So again, there's not a... As the indictments allege conduct that spanned a period of time, which is the same period we're talking about in the U.S. conspiracy. Roughly. But again, the indictments came long after, and as Dr. Velturo admitted on his own actuation theory, there's not a scintilla of evidence that anybody in the U.S., at Nestle USA or any of the defendants, had any knowledge of these alleged activities in Canada at the time they were going on. And again, on the list prices, what you see in Canada is a pattern of conduct. You go to trade association meetings, and people are having discussions. Executives, presidents of the companies discussing prices, discussing their raised prices. They're passing envelopes. They're destroying them afterwards. And all that evidence, traditional evidence, again, will keep their antitrust lawyers up at night. And what do we have down here? What do we have down here after Cadbury cooperated and after 150 depositions and 12 million documents? Zero. That's what distinguishes this case from, you know, if you look at any case in which civil judgment has been affirmed in the Third Circuit. Your Honor asked about flat glass and binning food. What you see is you see exchange, you see communications among high-level executives about a subject matter of the conspiracy. You don't have that here. And indeed, if you look at baby food, while they didn't find parallel pricing, there was an extensive detailed analysis of the plus factors in baby food. And there was at least a page of Cadbury providing pricing information in advance to Beech-Nut, and Beech-Nut provided the same thing, on and on and on and on, that what plaintiffs have managed to drag into this case pales by comparison. And yet the court said sporadic. It really didn't do anything because it wasn't among the decision-makers, and there was no evidence that it had any impact whatsoever on the case. Okay, Mr. Moore. On that, we thank you very much. Thank you. And we'll call Mr. Montag back for three minutes of rebuttal. Thank you, Your Honor. Again, I apologize for my loss of thought. Getting back to the consideration of considering an increase by Mars and that issue, what is interesting, if it was a rumor, one should look what Hershey did. That Hershey, at the same time that Hershey – the first thing Hershey did was it put its team together to look at pricing, just at the time that it got that rumor. And it also coincided with the fact – Well, isn't that appropriate? That's not conspiracy. Well, no, but it's evidence why Hershey – their costs were under control. Why would they start looking at pricing at that time when, in fact, they didn't need to? And the other thing that they did was that they started to revamp their computer programs so that they could, in fact, be ready to increase prices in the end of the year, beginning of 2003, which they otherwise couldn't have done had they not gotten this information. Mr. Markey, you mentioned their costs were under control, and the briefing talks about how they recovered through their hedging through 2004. But their rejoinder to that is that they were anticipating cost pressure. Are they entitled to do that or not? I suppose they are, but it's very interesting, Your Honor, that the experts that all the defendants hired only referred to present costs or past costs, and in their reports they didn't even consider future costs. So it's very hard to believe – there's nothing in Hershey that says we're concerned about future costs. In fact, in 2004 – Well, in Hershey's initiative. That was in Warren's initiative? In 2002, yes. But in 2004, Hershey said, hey, when we send out our announcement, we have to be careful because our profits are at an all-time high, our stocks are at an all-time high, and our costs for commodities and all other costs are under control. That's in 2004. So Hershey was in good shape. And it's very odd that they would, A, start considering or putting their pricing team together at the same time that Morris was – They were in good shape, but it was a bad market. They may have been in good shape, but the market for chocolate was not the best at that time. That's what the evidence shows. Well, as a result of the 2002 price increases, they made a lot of money, and that's why in 2004, when they again raised prices, they said we've got to be careful what we say because everybody knows we're doing really well. Our stocks are at an all-time high. In 2004, but in 2002, that was not the case. Well, I don't – their profits – there's no evidence that their profits were low in 2002 because a large group within Hershey did not want to raise prices. And in fact, in 2007, it got interesting. First of all, it's very unusual that the prices were raised by Morris in 2007 in March or April. And it's unusual that Hershey started looking at its prices in February of 2007 in anticipation of that. And it's interesting that when the announcement came out, Hershey said, hey, we have to wait 12 days before we make an announcement because it will communicate to our customers that we were caught unaware. Well, that's unusual for somebody, a competitor to say. I think the other thing is Mr. Cavanaugh referred to analysts. Well, where do analysts get their information? They get their information from the people in the industry. Mr. Cavanaugh's report said nothing about Morris considering. It just talked about commodity prices generally. So I think if you put all that together with all of the other evidence, it can form a reasonable inference. Okay, Mr. Hohentag, we thank you. Your time is up. Thank you very much, Your Honors. Mr. Shannon. Your Honors, I'd like to very quickly do two things, clear up some misstatements that the defense counsel made, and then give the court some very specific citations to the record because fundamentally this appeal is about what's the evidence show. With respect to the misstatements, Mr. Bill Terrell did not say there was no evidence linking Canada and the United States. He said there was no direct evidence, so he would not have included things like the evidence that I laid out for the court today. Mr. Bill Terrell did not say that you could expect follow-the-leader pricing in an oligopoly. He said you might expect it. And that's also what baby food says. That's also what flat glass says. That's also what Petruzzi says. Not that you're automatically going to get super competitive pricing in an oligopoly, but that you might. And that's why you need to have plus factors in a case like this. Counsel for Hershey said that the plaintiffs have dropped the packaged candy claim. The district court said the same thing. That's not true. We pointed out in our brief that the individual plaintiffs have not dropped that claim. We say it is in the same market as the singles and the kings. Now, with respect to line pricing that was asked very early on, Your Honor, the best citations in the record for the fact that not all retailers line price, all these citations are to the joint appendix, page 6006, 6265, 6268. So they seem to accept that when the three lawyers spoke on behalf of the companies, but the question would become are they entitled to base their pricing strategy on what they use their word, the rampant line pricing in the industry. Well, it's a disputed issue of fact as to the prevalence in the industry, number one. Well, no, but it's not disputed that at least Mars with their fast follower policy, that that was based on their understanding or their belief that line pricing was rampant. Is that right? That is disputed in the record, Your Honor, number one. Where is it disputed that Mars' fast follower policy was based on their understanding, even if it's mistaken, that line pricing was rampant? I don't have that specific citation, but the other thing I will point out is that even when retailers so-called line price on list prices, there's all kinds of promotional pricing and also placement within the retail store. So even though it would say- Is that different than transfer? It's a little bit different in the following respect. I think it would be helpful if I give you a specific example. Let's say Rite-Aid charges the same price for all three manufacturers' products, but they have an end cap display. As you're going through the checkout, the candy bar that Rite-Aid pays the lease for gets put right there so that you get more volume. It's the same thing as selling it for less, and that is rampant in the retail industry. That's what's rampant. There's very good reasons, and that's why the price increases in 2001 and 2002 failed. Some other citations. The fact that Mr. Brown, after the 2003 incident, specifically discussed what happened in Canada with Mr. Lenny. That's page 6241. The fact that Hershey, in fact, followed as Mars requested. That's 6242. That the same thing happened in the 2005 Canada price increase, pages 6249-50, and then again at page 8316. That the same thing happened again at 2007 price increase with respect to Hershey and the Canadian price increase, 6258-66. The fact that Mars Canada had to get U.S. approval to reduce the trade spend in 2002, 6212-13. The fact that competitive information on price increases flowed both ways from Mars Canada to Mars U.S. and vice versa, 6239-40. The fact that Canada price increases required U.S. approval, not just information, but approval, 6209-11. By the way, I did misspeak with respect to Nestle only, in terms of the same exact executives having pricing authority. Mr. Wall was correct about that. But here's the record evidence. That Mr. Leonidas, the chief leader in the Canadian conspiracy, kept his U.S. colleague apprised of pricing and vice versa, 6239-41. That the U.S. executives specifically used the Canadian leader follower to see what the U.S. firms would do. That is, he specifically looked at Canada to predict what would happen in the United States, 6214-15. The fact that Hershey U.S. was aware that if people follow in Canada, it follows as might the day that they will follow in the United States, 6215.  All right, thank you. And we want to thank all counsel for an excellent argument, an excellent presentation, both your written and oral presentation on a complex case and an interesting case, one we can all relate to. And we'll take the matter under advisement.